IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
- BROWNSVILLE DIVISION -

| | | |
|---|---|---|
| PATRICIA SALCIDO | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-97-068 |
| | § | |
| JANET RENO, ATTORNEY GENERAL | § | |
| DEPARTMENT OF JUSTICE | § | |

## MEMORANDUM OPINION

Pending before this court is Defendant Janet Reno's, Attorney General Department of Justice as Agent for the Immigration and Naturalization Service/United States Border Patrol, Motion to Dismiss and Alternative Motion for Summary Judgment with Supporting Memorandum of Law. (Docket No. 34). Plaintiff Patricia Salcido has filed her Response to Defendant's Motion to Dismiss and in the Alternative Motion for Summary Judgment with Supporting Memorandum of Law. (Docket No. 40).

For the reasons set forth below, this court is of the opinion that Defendant's Motion to Dismiss and Alternative Motion for Summary Judgment be GRANTED.

## CAUSE OF ACTION

Plaintiff Patricia Salcido ("Salcido"), a Border Patrol agent, brings this suit against Defendant Janet Reno as Agent for the Immigration and Naturalization Service ("INS") for alleged violations of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 2000e *et seq.* (Docket No. 27, First Amended Complaint). Pursuant to Title VII, Salcido asserts a cause of action for sex discrimination and hostile work environment. *Id.* Salcido seeks to hold INS vicariously liable under Title VII for the actions of several supervising Border Patrol employees. *Id.*

## FACTUAL BACKGROUND

The factual background is derived from a review of Salcido's Amended Complaint (Docket No. 27), Defendant's Motion to Dismiss and in the Alternative Motion for Summary Judgment (Docket No. 34), and Defendant's Exhibits to the Motion to Dismiss (Docket No. 34, Exs. A - I ).

Salcido seeks to impose vicarious liability on her employer, the INS, for the alleged actions of Border Patrol Agents Fernando Quiroga ("Quiroga"), Juan Serrata ("Serrata"), Gabriel Bustamante ("Bustamante"), Mike Richardson ("Richardson"), and Assistant Chief Patrol Agent In Charge ("APAIC") Art Moreno ("Moreno") as her supervisors. (Docket No. 27). In her Amended Complaint, Salcido lists a number of allegations in support of her sexual discrimination/hostile work environment claim. *Id.* These allegations can be summarized as follows: agents spreading rumors that Salcido was having an affair with another Border Patrol agent and implying that the rumors were true by driving by Salcido's home; writing profanities on Salcido's vehicle; defacing Salcido's picture placed on public display; posting of a cartoon referring to Quiroga and Salcido in a derogatory nature; treating male agents more leniently; ignoring Salcido and encouraging others to avoid speaking to her; being called a derogatory names by Quiroga (such as, "20 watts"); showing other agents an unflattering picture of Salcido; abandoning Salcido when her vehicle was stranded in the sand; being threatened with insubordination; being denied bike patrol duty; being forced to return to work during the 1995 government furlough despite her continuation of pay ("COP") status for an injured finger; and being rated unfairly. *Id.*

The events alleged by Salcido span a three year period, from 1992-1995, during Salcido's employment with the INS at the Brownsville station. *Id.* The extensive record in this case reveals that Salcido made two informal Equal Employment Opportunity ("EEO") complaints which were

2

promptly addressed. (Docket No. 34, Ex. A). However, the events giving rise to these complaints and the settlements resolving them form the background against which a formal EEO complaint and the instant lawsuit developed. (Docket No. 34, Ex. H). Accordingly, the major incidents at issue in this case are outlined below.

Salcido, currently a Border Patrol Agent at the Brownsville Station, was hired on February 9, 1992 in a trainee position. (Docket No. 34). As a trainee, Salcido attended post academy instruction in Brownsville and was subsequently assigned to work with senior agents. *Id.*

### FIRST INFORMAL COMPLAINT

The first informal EEO complaint centers on the actions of Senior Border Patrol Agent Quiroga, Salcido's post academy instructor. Salcido alleges that in November of 1993, Quiroga intervened when she apprehended an alien, insulted her, and accused her of insubordination in front of other law enforcement officers. (Docket Nos. 27 & 34). She further alleges that as her training officer, Quiroga was harder on her than on the other agents. (Docket No. 34. Ex. A; Ex. C. pp. 16-18). Upon filing an informal complaint based on these incidents, Salcido alleges that co-workers teased her and spread rumors regarding her decision to file. (Docket No. 34, Ex. C, pp. 16-20). Salcido also claims that Border Patrol Agents Roel Rosales ("Rosales") and Gerardo Perez ("Perez") solicited other agents not to speak to her or contact her on the radio at work. *Id.*

The record reveals that Salcido brought the complaint to the attention of her supervisor Serrata and the matters addressed therein were resolved in the following manner. Serrata spoke with Rosales and Perez the day after Salcido reported their alleged solicitations. Although Rosales and Perez denied such allegations, Serrata instructed them to cease such activities. Further, on December 2, 1993, a meeting was held to address Salcido's concerns. Present at the meeting were

3

EEO Counselor Herb Monette ("Monette"), Supervisors Serrata and Moreno, Quiroga, union representative Jesus Arellano, and Salcido. Quiroga apologized for his behavior and her supervisors agreed to conduct a meeting to address the subject of rumors. (Docket No. 34, Ex. C, pp. 18, 403, 424 & 537).

On December 2, 1993 a "unit meeting" was held to address Salcido's allegations. Salcido, however, complains that the meeting was supposed to be a "station" meeting rather than a "unit" meeting. Further, Salcido states that Serrata did not read from the Border Patrol Handbook as had been agreed pursuant to the informal settlement agreement. Serrata testified at the administrative hearing that he addressed the rumor issue at a Muster call on two different occasions. Moreno testified that upon Salcido's complaint that Serrata was not addressing the rumors, he directed Serrata to conduct another meeting.[1] Subsequently, Moreno considered Salcido's concerns resolved as she "never complained to [him] about the matter" again. As to Quiroga, in an affidavit submitted with her EEO formal complaint, Salcido stated "[s]ince this meeting took place we now get along very well and he [Quiroga] treats me with the same respect as the male agents." (Docket No. 34, Ex. A & attachment no. 3; Ex. B, pp. 23-27 & attachment no. 1; Ex. C. pp. 12-15, 94, 561 & 595; and Ex. F pp. 19-21).

Salcido alleges that three months after the meetings, she continued to have problems with agents. (Docket No. 34, Ex. H). Specifically, Salcido complains that she was given the "cold shoulder," that agents directed their radio transmissions to her partner instead of her, and that agent Vicki Stolenski refused to stop for lunch with Salcido despite agreeing to stop for breaks with other

---

[1] Upon investigation, Moreno learned that Salcido had been absent the day of the meeting. Nonetheless, Moreno ordered Serrata to conduct a subsequent meeting in Salcido's presence. (Docket No. 34, Ex. H).

4

agents. Based on these incidents, Salcido contacted Assistant Chief Patrol Agent Agustin Garcia ("Garcia") claiming that the Brownsville station had failed to adequately resolve her problems. *Id.* Garcia indicated that he would immediately contact Patrol Agent in Charge Robert Wooten ("Wooten") to resolve the matter. Salcido later indicated to Monette that as a result of her conversation with Garcia, her situation had improved "drastically." At the administrative hearing, Salcido further testified that Garcia "must have talked to somebody" because the rumors stopped for at least three to four months. "So something was done." (Docket No. 34, Ex. A, attachment Affidavit pp. 12-14; Ex. C., pp. 28 & 431-432).

## SECOND INFORMAL COMPLAINT

The incident which gave rise to Salcido's second informal complaint concerns an unidentified individual having written "Fuck you bitch" in the dust of her vehicle window in November 1994. However, the record reveals allegations that Salcido began to experience problems prior to November 1994.

On October 31, 1994, Salcido states that her picture on the office bulletin board was defaced. Salcido states she reported this to Moreno and informed him that rumors were still circulating about her. Later that afternoon, Moreno posted a bulletin which advised agents not to deface photographs. In regards to the rumors, Moreno advised Salcido that there was nothing he could do unless she gave him specific names of those agents involved. There is no evidence in the record, however, that Salcido ever provided Moreno with the names he requested. (Docket No. 34, Ex. A, attachment Affidavit pp. 15-16; Ex. C, pp. 16 & 30).

On November 3, 1994, Salcido alleges that she confronted Border Patrol Agent Sergio Ramirez ("Ramirez") as to why he was telling others that he did not want to work with her. Salcido

claims that three hours after this confrontation, she noticed someone had written "Fuck you bitch" on the back window of her vehicle. Salcido reported this incident to Wooten and told him that this was a direct result of her filing an informal complaint against Quiroga. Salcido claims that Wooten told her to ignore it and attempted to dissuade her from contacting Garcia. However, the record reveals by Salcido's own admission, that Wooten consoled Salcido and escorted her to his office so that she could telephone Garcia in private. Later that afternoon, Wooten posted a memo regarding professionalism and required each agent to initial it to indicate they had read it. Salcido also states that she heard that Bustamante had addressed this incident at Muster on November 4, 1994, her day off. (Docket No. 34, Ex. C, pp. 31-32, 33, 179, 293; Ex. F, attachment no. 3).

In her conversation with Garcia, Salcido states that he asked her to take a picture of the car and prepare a memo. Garcia testified that Salcido never sent him the requested items. Nonetheless, Garcia stated that he decided to take "more serious" corrective action in response to Salcido's informal complaint. On November 30, 1994, Garcia conducted a stationwide meeting at which Wooten and Monette made presentations. Salcido testified that she "felt real good about the meeting," that agents who had stopped speaking to her began speaking with her again, and that Monette told her that several agents had approached him after the meeting and expressed a "positive" attitude. (Docket No. 23, Ex. A, attachment Affidavit pp. 18, 20; Ex. C, pp. 37-38, 433-434).

THE FORMAL EEO COMPLAINT

On December 8, 1994, Salcido learned from other agents that Bustamante and Rosales had driven through her apartment complex in search of Agent Ruiz when he was two hours late in returning from his dinner break. Salcido claims that Bustamante's actions had contributed and lent

credence to the rumors regarding her alleged affair with Ruiz. These rumors had been the basis of her second informal complaint.

The record reveals the following events. On November 14, 1994, Ruiz was late in returning from his dinner break. Border Patrol Agent Doug Spielman ("Spielman"), the agent relieving Ruiz, attempted to contact Ruiz by radio. Ruiz alleges that he was dining at Luby's and his radio was off. Bustamante, who was driving with Rosales, heard Spielman's radio search and began looking for Ruiz. After searching a bridge, a park, and several roads, Bustamante drove to Salcido's apartment complex. (Docket No. 34, Ex. C, pp. 254-257).

Bustamante testified that he was concerned for Ruiz's safety. His decision to search for Ruiz was prompted by Bustamante's personal observations of Ruiz and Salcido's "overly friendly" interactions, and knowledge of a phone call by Mrs. Ruiz to Wooten regarding her concern that Salcido and her husband were having an affair. Salcido, however, alleges that his search was prompted by the office rumors that she and Ruiz were engaged in an affair. (Docket No. 27; Docket No. 34, Ex. C, pp. 238 & 262-264).

Bustamante further testified that he did not tell Rosales that the complex he was driving through was Salcido's nor did he tell Rosales the reason for driving through the complex. Rosales testified that he did not recall Bustamante indicating why they were at the apartment complex or what they were doing. Rather, Rosales testified that based on his knowledge that Salcido's apartment complex was located "in that area," he "made [his] own conclusion" as to why they were there. (Docket No. 34, Ex. C, pp. 204, 257, 325-327 & 327-329).

Salcido states that upon learning of this incident, she informed Ruiz and they both agreed to confront Bustamante. Salcido claims that she "chickened out" and did not speak to Bustamante.

7

Ruiz, however, spoke to Bustamante who denied the incident. Afraid that Bustamante would hold the confrontation against both agents, Salcido contacted Monette to file an EEO formal complaint. (Docket No. 34, Ex. C, pp. 39-40).

In response to her complaint, Monette interviewed Bustamante in January of 1995 and Bustamante admitted to the apartment complex drive-by incident explaining that his actions were based on his concern for the officer's safety. Salcido claims that Monette explained that Sector had accepted Bustamante's explanation for the drive-by and offered to set up a meeting regarding the incident. Salcido states that she refused because "she did not see any point in the meeting, since Sector approved of [Bustamante's] actions." The record reveals that Salcido discussed with Monette the possibility of requesting a transfer to the Border Patrol academy in Glynco, Georgia as a means of obtaining temporary relief from the situation at work. However, Garcia testified that Salcido never applied for the transfer or indicated to him that she wanted to request such action. Further, Salcido states in her affidavit accompanying her formal complaint, that she "never told management that [she] wanted a transfer." (Docket No. 34, Ex. A, attachment Affidavit p. 22; Ex. C, pp.44-45, 437-439, 441 & 450).

Monette subsequently contacted Garcia regarding the incident. Garcia testified that he asked Monette if Salcido wanted to have a meeting, to which Monette answered that Salcido did not but that she planned to file a formal complaint. Garcia claims that he took no further action as he thought it best to let the EEO process run its course. (Docket No. 34, Ex. C, pp. 439, 441 & 450).

8

## ADDITIONAL ALLEGATIONS

In support of her hostile work environment claim, Salcido raised additional allegations at the administrative hearing on her formal EEO Complaint and raises other incidents for the first time in her Amended Complaint. These allegations are summarized below.

Salcido alleges that she suffered reprisal and retaliation because she was unfairly denied bike patrol duty. However, in her deposition in this case, Salcido states that she was given two one-year stints of bike patrol duty, one recently spanning from 1997-1998. (Docket No. 34, Ex. A, pp. 83-88).

Salcido claims that on one occasion she was abandoned by fellow agents when the Border Patrol suburban she was driving got stuck in the sand in the early morning hours. However, the record reveals that two agents responded to her call, attempted unsuccessfully to free the vehicle from the sand, and radioed Rosales requesting a chain. In her deposition, Salcido states that she was assisted out of the sand forty-five (45) minutes later. (Docket No. 34, Ex. A, pp. 95-100; Ex. C, pp. 75-77, 148-149, & 354-358).

Salcido also complains of a cartoon that was posted in the squad room in May of 1994. On the cartoon, someone had written in the star numbers[2] identifying Quiroga and Salcido as the two characters. Salcido claims that the cartoon placed her in an embarrassing light. However, Salcido states that she does not know who posted the cartoon, nor how long it was posted, and never complained to management about it. (Docket No. 34, Ex. A, pp. 61-64).

In an affidavit to her Response to Defendant's Motion, Salcido states that Quiroga referred to her as "20 watts" on several occasions in February 1993. The record offers no evidence, however, that the name calling persisted after Salcido asked Quiroga to stop. (Docket No. 40, Ex. "1").

---

[2] Star numbers are numbers used by agents as personal identifiers.

9

During the 1995 government-wide furlough, Salcido states that she was forced back to work from her COP status to answer telephones. Salcido had been placed on COP status because of an injured finger. Salcido alleges that others in her situation were not required to return to work. (Docket No. 34, Ex. A, pp. 90-94).

Salcido's final allegation is that she was denied a transfer from Brownsville to relieve her from the harassment. There is no evidence in the record to support this claim. Salcido, in her deposition, states that she never requested a transfer other than in her formal complaint to Monette. (Docket No. 34, Ex. A, pp. 89-91).

In her Amended Complaint, Salcido makes general allegations that she was rated unfairly. Yet, the record reveals that in her 1994 and 1995 Supervisory Appraisals, Salcido received the highest evaluation rating, i.e., "highly recommended." Additionally, at the time of Salcido's April 1998 deposition in this case, she had received a step increase. (Docket No. 34, Ex. A, pp. 115-116 & 117-122).

Salcido alleges that as a proximate result of these agents actions she has suffered loss of step-pay increase, promotion opportunity, transfer opportunity, mental and emotional stress, anxiety, loss of job satisfaction, fear of reprisal, and public embarrassment and humiliation. Further, Salcido alleges that as a result of her complaints, she has suffered reprisal and retaliation including denial of transfers, continued duties with the bike patrol, and termination of furlough. Salcido seeks an award of damages, attorneys fees, and equitable relief including transfer. (Docket No. 27).

## LEGAL ANALYSIS

## STANDARD OF REVIEW

Review of an administrative judge's decision is de novo. *See Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 470 n. 7 (1982) (decisions by the EEOC do not preclude a trial de novo in federal court).

Defendant INS's Motion is treated as a Motion for Summary Judgment as it is supported by extra-pleading material. Fed. R. Civ. P. 12(b). Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). All reasonable doubts and inferences must be decided in the light most favorable to the party opposing the motion. *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358-359 (5th Cir. 1988). If there appears to be some evidentiary support for the disputed allegations, the motion must be denied. *Walker*, 853 F.2d at 358-359.

## HOSTILE WORK ENVIRONMENT/SEXUAL HARASSMENT

To establish a viable sexual harassment claim alleging hostile work environment, the following five-factor test must be met: (1) The employee belongs to a protected group; (2) The employee was subject to unwelcome sexual harassment; (3) The harassment complained of was based on sex; (4) The harassment complained of affected a "term, condition, or privilege of employment," i.e., the sexual harassment must be sufficiently sever or pervasive so as to alter the conditions of employment and create an abusive working environment; and (5) The employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999); *Jones v. Flagship International*, 793 F.2d 714, 719-720 (5th Cir. 1986), *cert. denied*, 479 U.S. 1065 (1987). However, in a case where an

11

employee brings a Title VII sexual harassment suit alleging harassment by a supervisor with immediate (or successively higher) authority over the employee, only the first four elements of the test outlined above need be satisfied. *Jones*, 793 F.2d at 719-720; *see Williamson v. City of Houston*, 148 F.3d 462, 464 (5th Cir. 1998) (applying fifth factor). Once the employee makes this showing, an employer is subject to vicarious liability for the hostile environment created by the supervisor. *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2292-2293 (1998).

A defending employer is afforded an affirmative defense to liability or damages so long as it can establish that the supervisor's harassment did not culminate in a "tangible employment action" against the employee. *Faragher*, 524 U.S. 775, 118 S.Ct at 2293. Although no concise definition exists, the Supreme Court did note that a "tangible employment action" constitutes "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 2268. The employer's defense is subject to proof by a preponderance of the evidence and consists of two prongs, both of which the employer must establish. *Watts*, 170 F.3d at 509. First, the employer must show that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior. *Id.* at 509-510. Second, that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Id.*

A. The Sexual Harassment Claim

The INS agues that Salcido's claims for sexual harassment based on a hostile working environment must fail because the alleged acts are not extreme, severe, or pervasive so as to alter

12

the terms and conditions of her employment. Salcido argues that in light of the totality of the circumstances, she was subjected to a sexually objectionable environment.

For sexual harassment to be actionable, it must be sufficiently severe or pervasive so as to alter the condition of the plaintiff's employment and create an abusive working environment. *Meritor Savings Bank, F.S.B. v. Vinson*, 477 U.S. 57, 67 (1986). Whether an environment is "hostile" or "abusive" is determined by the totality of the circumstances, including the frequency of the conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). To be actionable under Title VII, a sexually objectional environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so. *Faragher*, 524 U.S. 775, 118 S.Ct. at 2283.

The factors enumerated by the Supreme Court all militate toward the conclusion that Salcido's claim for sexual harassment must fail. First, the allegedly discriminatory conduct was infrequent. The frequency factor afford Salcido little support given that the alleged acts occurred at irregular intervals over three years. *See Butler v. Ysleta Independent School District*, 161 F.3d 263 (5th Cir. 1998) (finding that anonymous letters received by two female teachers from principal over a year and a half was infrequent.); *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596 (5th Cir. 1995) (finding that "[f]our printed derogatory references to [the plaintiff] at irregular intervals in two and a half years do not evince sufficient hostility toward her as a matter of law"), *cert. denied*, 516 U.S. 974 (1995).

13

Second, the alleged acts were not severe. This court agrees that the rumors regarding her filing complaints and the alleged affair with Ruiz, the derogatory message on Salcido's vehicle, and agents' elementary school conduct was offensive. However, these acts were not severe. *See Butler*, 161 F.3d at 269 (finding that sending harassing anonymous letters, a greeting card with a picture of naked buttocks and derogatory message, and a cartoon entitled "Bitch Woman" is not severe conduct by supervisor). The rumors and derogatory message are equivalent to a mere utterance of an epithet that engenders offensive feelings. *Shepeherd v. Comptroller of Public Accounts of State of Texas*, 168 F.3d 871 (5th Cir. 1999).

Salcido cites a Third Circuit Case, *Spain v. Gallegos*, 26 F.3d 439 (3rd Cir. 1994), for the proposition that rumors of an affair establish a gender-based hostile environment claim. *Spain* is not binding precedent in the Fifth Circuit. Second, Salcido's case falls into the category of cases distinguished by the Third Circuit, ie., cases in which the situation was merely one of idle gossip about an alleged office romance. It seems that much of the rumor-mongering about Salcido came from co-workers rather than by supervisory agents. Although the apartment complex drive-by incident may have contributed to the circulation of rumors, Salcido has presented no evidence that would allow this court to conclude that Bustamante did it to promote or spread rumors.[3]

Third, none of the agents' actions physically threatened Salcido. Salcido alleges that she was abandoned by other agents when her vehicle became stuck in the sand at one o'clock a.m. However, the record reveals that the agents responded to Salcido's call for help and pulled her out of the sand within forty-five (45) minutes. Taken alone, this isolated incident does not substantiate a finding

---

[3]In response to Salcido's second informal complaint, Garcia asked her to produce a list of names of those from heard she had heard rumors. However, Salcido never came forth with any names.

14

that Salcido was physically threatened. Nor can this court find that the events such as the posting of the cartoon, the defacement of her picture, and the derogatory comment on her vehicle physically threatened Salcido. Given the anonymous nature of these actions, this court does not place much weight on this consideration. *Butler*, 161 F.3d at 269. The cartoon, derogatory comment, and picture had no threatening content. At worst, a reasonable person receiving such messages could be afraid that someone dislikes her, but this does not support a finding that a workplace environment is hostile. *Id.* at 269.

Finally, the agents' conduct would not interfere unreasonably with a reasonable person's workplace. Quiroga's "20 Watts" comment, returning to work during the furlough, Stolinski's lunch refusal/cold shoulder, all equate to "simple teasing, offhand comments, and isolated incidents" which do not amount to discriminatory changes in the terms and conditions of employment. *Faragher*, 524 U.S. 775, 118 S. Ct. at 2283. Further, Salcido's recent pay-step increase and the "highly recommended" evaluation ratings do not support a finding that the agents' conduct undermined Salcido's workplace performance. Therefore, it cannot be said that the alleged conduct would unreasonably interfere with a reasonable person's work performance.

Salcido's claims involve far less objectionable circumstances than those for which the courts afford relief. *See Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 805 (5th Cir. 1996) (finding that frequent egregious comments about sexual proclivity created hostile environment); *cf. Long v. Eastfield College*, 88 F.3d 300, 309 (5th Cir. 1996) (finding single joke involving condoms insufficient to create hostile work environment). This court finds that based on a consideration of all the circumstances, the agents' conduct did not render Salcido's work environment objectively "hostile" or "abusive."

15

## B. Employer Vicarious Liability

Salcido's sexual harassment claim fails on another basis. Salcido cannot establish INS's liability as her employer. The Supreme Court's decisions in *Ellerth* and *Faragher* impose vicarious liability subject to an employer's two-prong affirmative defense. However, these Supreme Court cases do not directly speak to the circumstances before us, a case in which a plaintiff quickly resorted to an employer's grievance procedure, and the employer took prompt remedial action. *Ellerth* and *Faragher* both involve complaints of supervisor misbehavior wherein the plaintiffs never implemented or claimed not to be aware of the company's remedial policies. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). For the purposes of imposing vicarious liability, a case presenting only an incipient hostile work environment corrected by prompt remedial action is distinct from a case in which a company was never called to react. *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 265 (5th Cir. 1999). Accordingly, the *Ellerth/Faragher* defense is not applicable.

The Fifth Circuit case of *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 265 (5th Cir. 1999) squarely addresses the circumstances before us and therefore governs. In *Indest*, the court noted that in a case presenting only incipient hostile work environment corrected by prompt remedial action, the *Ellerth/Faragher* standard is not controlling. *Indest*, 164 F.3d at 265.

In *Indest*, the Plaintiff sought to impose vicarious liability against her employer for sexual harassment by her immediate supervisor. *Id.* at 259. The plaintiff promptly reported all the incidents to her branch manager and the human resources director. *Id.* at 260. Pursuant to the company's sexual harassment policy, the human resources director investigated the complaint, interviewed witnesses, and issued a verbal and written reprimand to Plaintiff's supervisor. *Id.* at 261.

16

Subsequently, Plaintiff revealed her intention to file an EEOC charge because she feared retaliation. *Id.* A human resources employee then flew to visit with Plaintiff. *Id.* The human resources manager also met with Plaintiff and informed her that her supervisor would be suspended for seven days, promised that her supervisor would not work with her at future trade shows, guaranteed that her job would not be jeopardized, and promised to pay for any counseling. *Id.* In addition, the president of the company issued Plaintiff a written confirmation of the disciplinary action taken against her supervisor. *Id.*

The Fifth Circuit subsequently reasoned that imposing vicarious liability on an employer for a supervisor's hostile environment actions despite its swift and appropriate remedial response would undermine both the Supreme Court's holding in *Meritor*[4] and Title VII's deterrent policy. *Id.* The Court reasoned that because Plaintiff promptly complained of her supervisor's harassing conduct and because the company promptly responded, disciplined her supervisor and stopped the harassment, the district court properly granted judgment as a matter of law to relieve the company of Title VII vicarious liability. *Id.* at 267.

Applying the foregoing analysis to Salcido's case, this court concludes that INS's prompt remedial response to all of Salcido's complaints relieves it of Title VII vicarious liability. It is clear from the record that once Salcido contacted Moreno, Garcia and Monette regarding the rumors, the defacement of her picture, and the derogatory message on her car, these individuals took steps to

---

[4] In *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986), the Court held that an employer is not automatically liable for harassment by a supervisor who creates a sexually hostile work environment. *Id.* at 266.

17

rectify the situation. That is posted memoranda and notices, reprimanded agents, and held unit meetings and station meetings to address topics of professionalism, ethics, and agent conduct.

The record further reveals that INS appropriately responded to the incident regarding Bustamante's drive by of Salcido's apartment complex. The fact that Salcido heard about the incident after the November 1994 station meeting[5] is not sufficient to suggest that the meeting failed to put an end to the rumor mill. In light of no evidence in the record that rumors were still being spread about Salcido and Ruiz after the November meeting, we agree with the administrative judge's observation that it is possible that the other agents were merely apprising Salcido of the event that had transpired. Further, Monette offered to hold a meeting with Garcia regarding the incident and Salcido declined.

The long history of the INS's demonstrated concern and prompt response to Salcido's complaints cannot be deemed a failure to take appropriate response. Viewing the harassment in conjunction with *Indest* and existing case law, this court finds that INS's prompt remedial action in response to Salcido's allegations of harassment relieve the INS of Title VII vicarious liability. Title VII is not a general civility code for the workplace and it is not designed to rectify every unpleasant aspect of one's co-workers or supervisors' behavior. *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75 (1998).

This court's finding is further warranted in light of the fact that the agents' conduct did not culminate in a "tangible employment action, such as discharge demotion, or undesirable reassignment." *Watts*, 170 F.3d at 509. In her Amended Complaint, Salcido makes broad

---

[5] The November 30, 1994 meeting was held in response to Salcido's second informal complaint. See supra p. 6.

in the record to support Salcido's allegations. At the time of Salcido's April 1998 deposition in this case, she had received a step-pay increase. (Docket No. 34, Ex. A, p. 115). Her testimony further reveals that she was given the highest evaluation rating, i.e., "highly recommended," in her 1994 and 1995 Supervisory Appraisals. *Id.* at 115-122. Salcido also states that she never applied for a transfer pursuant to her discussion with Monette in 1995. Finally, the evidence shows that Salcido was given two one-year stints of bike patrol duty. *Id.* at 83-88.

For the reasons stated above, this court holds that Salcido has not raised a genuine issue that the harassment affected a "term, condition, or privilege" of employment. Accordingly, this court finds that the Defendant's Motion to Dismiss and Alternative Motion for Summary Judgment is GRANTED.

DONE at Brownsville, Texas, this 6th day of May, 1999.

_____
John Wm. Black
United States Magistrate Judge